LAMAR v. DETROIT APARTMENTS CORPORATION.

1. Specific Performance—Not a Remedy of Right.

Specific performance is not a remedy which may be claimed as a matter of right, but primarily it rests on the incompleteness or inadequacy of the remedy at law as applied to the contract sought to be specifically enforced under the facts shown.

2. Vendor and Purchaser—Condition Precedent—Payment on Fixed Date.

Vendor's obligation to finish construction of apartment houses, sold on contract, and grade and sod the lawn, where no time for performance thereof was fixed, was not

[1]Specific Performance, 36 Cyc. pp. 548, 552; 25 R. C. L. 228; 3 R. C. L. Supp. 1413; [2]Id., 36 Cyc. p. 699; Vendor and Purchaser, 39 Cyc. p. 1608 (Anno).

a condition precedent to vendee's making his second payment on the contract, which was fixed at a time prior to which performance of vendor's obligation was impossible.

3. SPECIFIC PERFORMANCE — BILL PROPERLY DISMISSED WHERE PLAINTIFF KNEW SPECIFIC PERFORMANCE IMPOSSIBLE.
Where vendee, at the time he commenced suit for specific performance of a land contract, was in default in making payment, and knew that vendor had sold the property to other innocent purchasers rendering specific performance impossible, the court below properly dismissed his bill, leaving him to his legal remedy, if any.

Appeal from Wayne; Chester (Guy M.), J., presiding. Submitted April 6, 1926. (Docket No. 5.) Decided January 3, 1927.

Bill by Alfred M. Lamar against the Detroit Apartments Corporation and others for specific performance of a land contract. From a decree dismissing the bill, plaintiff appeals. Affirmed.

*Daskam & Fox*, for plaintiff.

*Stevenson, Butzel, Eaman & Long* (*Charles F. Hemans*, of counsel), for defendants.

STEERE, J. This suit is for specific performance of a land contract entered into on January 8, 1920, between plaintiff, Lamar, and defendant Detroit Apartments Corporation. The property involved is known as lot 1, block 3, E. C. Van Husan's subdivision, located at the southeast corner of Sheridan and Canfield avenues, and at the time the contract was entered into the defendant corporation had practically completed erecting upon the property three two-apartment bungalows, known as 972 Sheridan avenue, 1342 and 1344 Canfield avenue east. The purchase and sale was through the Hannan Real Estate Exchange as broker for the vendor. The price for the property was

---

[3] Specific Performances, 36 Cyc. p. 747.

$25,000, $500 of which was paid on the signing of the agreement, $2,500 on or before March 1, 1920, and the balance of $22,000 in quarterly installments of $600 each or more including interest at 6% per annum on deferred payments.

Plaintiff did not pay the $2,500 installment falling due on March 1, 1920, and his failure to do so resulted in notice of default and claimed cancellation of the contract, which gave rise to this litigation.    Plaintiff's vocation is not disclosed beyond the fact he states that he "had been in the habit of buying and selling real estate."    The defendant corporation is an artificial legal entity of defendant Morris' creation, of which he said he was practically the owner and "sole boss," that he and his wife "are the only two that are pecuniarily interested," and he had held all but two shares since its organization.    He is a real estate operator, who in effect admitted organizing himself into corporations with dummy directors for conduct of his business, conducting it in their name or his own as deemed expedient.    Of the two shares in this corporation which he did not own, one was held by his wife, who was in California in 1920, and the other by an employee named O'Neill who acted as its president.    In this transaction it can be said without violence to any rule of right that Morris and the Detroit Apartments Corporation are one and the same thing and may be hereafter so referred to.    Defendants Davis and Stricker are subsequent purchasers from Morris of this property under contract, and innocent participants in this entanglement.

Shortly before January 1, 1920, when the three bungalows were approaching completion, defendant listed the property with the Hannan Real Estate Exchange, and its contract sale to plaintiff was effected through a Hannan salesman named Scott who got in touch with plaintiff and showed him the property. At that time the buildings were, as Morris claims,

substantially finished, four of the six apartments being occupied by tenants before January 8, 1920. The negotiations resulted in the contract in issue here after plaintiff, in company with Scott, had inspected the property to his satisfaction. At that time, as plaintiff testified, he pointed out to Scott certain imperfect work and absence of things essential to finished dwellings. It is not denied that a few things were required for proper completion of these buildings with modern conveniences as plaintiff pointed out to Scott, and provision was made for them in the contract, as follows:

"It is understood between the parties hereto that all electric fixtures, window shades and screens are included in the purchase price.

"Party of the first part agrees to grade and sod the lawn as soon as weather permits and to otherwise finish the construction of above premises in a thorough workmanship manner."

Although possession was to be given on or before March 1, 1920, at which time the $2,500 payment was to be made, it is not shown Lamar ever took possession. Before March 1, 1920, Scott spoke to Lamar about making the payment due on that date, but Lamar claimed to have visited the premises, and, finding that the repairs promised had not been made, he told Scott that he would not make the payment until such repairs had been made and the premises put in proper condition. Morris denies that he ever was advised that Lamar based his failure to make the payment of $2,500 on March 1, 1920, on the buildings' not being completed. There is testimony of interviews and claimed promises in that connection between Lamar and Scott, but Lamar did not make or tender the payment of $2,500 when it fell due or for several months thereafter, nor personally communicate with Morris, who did not know Lamar, or where he lived.

On March 12, 1920, Morris instructed Scott by letter as follows, as shown by his verified carbon copy:

"Please be advised that your client has failed to fulfill his agreement for the purchase of my bungalows and if he desires to renew his option on the purchase, I will consider same upon the payment of $500, if the deal will be closed previous to April 1st, or upon the payment of $1,000 if the deal be closed on or before May 1st.    My reason for being obliged to submit this proposition is because I have another chance for the sale of them.    Immediate action is necessary."

Scott denied receiving such letter.    Various communications between the parties through Scott as intermediary took place upon which the testimony is not altogether harmonious, but on May 7, 1920, Morris wrote Lamar as follows:

"Will you be good enough to advise me by return mail whether or not it is your intention to carry out your contract relative to purchasing property at Canfield and Sheridan."

To this Lamar replied on May 8, 1920:

"Am told that there is a great deal to be done to the property at Canfield and Sheridan before same will be in order.    When it is in proper shape shall be pleased to take up the matter of closing the deal with you."

Soon after entering into this contract, Lamar put the property in the hands of the Hannan Real Estate Exchange for sale through Scott.    On May 17, 1920, a Hannan agent named Richards found defendant Davis as a prospective purchaser of the Sheridan avenue property at a price of $11,000 and secured from her a written offer to purchase, through the Hannan agency without naming the vendor, under a contract with deferred payments extending over a period of time, accompanied by a deposit of $300.    Richards turned over the money and written offer to Scott who later turned them over to Lamar, who accepted the proposal and deposit, conditionally, as he claimed, but

never returned the deposit, stating he did not make any agreement to complete the building as he expected that would be done before the property would be delivered to the purchaser.

Lamar also states that he received another deposit on the rest of the property but returned it upon demand by the prospective purchaser for delivery of possession of the easterly of the two Canfield avenue apartments, as he would not enter into a final agreement "because I did not want to fix it up when I was promised to have it fixed up." Further activities on the part of Richards resulted in his obtaining an offer to purchase the two Canfield avenue places from defendant Stricker. Richards testified he did not know who owned that property and being unable to communicate with Scott he got into touch with Morris whom he had come to believe was the owner, and Morris arranged for a meeting with defendant Stricker, following which Stricker's offer for the property was accepted by Morris on May 28, 1920, and June 7, 1920, was agreed upon as a final date to close the deal. On the date last-mentioned Mrs. Davis also signed a contract to purchase from Morris the Sheridan avenue place. The erratic activities of the Hannan agency apparently resulted in Lamar and Morris dealing at long arm's length and neither of these subsequent purchasers are shown to have had any knowledge of Lamar's connection with the property.

As Lamar testified, he learned from Scott about May 29, 1920, that his deal with defendant Davis was not going through and the other two houses had been sold to defendant Stricker. On June 5, 1920, Lamar gave to Scott $2,500, including the $300 he had received from Mrs. Davis, with directions to make a tender of it to defendant. At that time another payment of $600 had fallen due on his contract. Morris refused to recognize the contract or payment to Scott as a

tender on it, and on July 7, 1920, a formal tender was made of $2,500 by two representatives of the Hannan agency to a young lady in charge of Morris' office, who refused to accept the same, telling them Morris was out of town and no one else representing the defendant was there.

Standing on his claimed right to make no further payments on his purchase until the promised work was done, which he apparently assumed was a condition precedent to making his payment of $2,500 on March 1, 1920, Lamar claimed the right to sell the property and put it in the hands of the Hannan agency to sell.     That agency found prospective purchasers at prices apparently satisfactory to him, from whom he took deposits, one of which he returned and one of which he kept, but did nothing more on those deals, for his reasons as stated.     Although notified by the Hannan agency on May 29, 1920, that his deal with Davis was not going through and the other two houses had been sold to Stricker, he did nothing further, except making the claimed tender of July 7, 1920, until September 21, 1920, when he commenced this suit for specific performance, filing his supplemental bill upon which this issue was framed on October 29, 1920. Defendant Morris, in his own name and for his corporation, pleaded issuably, as did defendant Stricker with a cross-bill asking confirmation of his purchase and credit on his contract for the cost of repairs and work he had done upon the two Canfield avenue houses, to put them in the condition contracted for. Morris had settled Mrs. Davis' claim for expenditures in repairing and completing her house, amounting to $131.50 and she only figured in this litigation as a witness.

After hearing the proofs and allegations of the parties in open court and arguments of counsel, the trial court first determined that the contracts given

by defendant Morris to defendants Davis and Stricker were valid and in full force, entitling them as innocent purchasers in good faith to the full benefit thereof; that defendant Stricker as an innocent purchaser in good faith relying upon representations made to him by Morris and his agents was also entitled to a credit upon his contract of $390.17 as of August 1, 1920, for repairs he was shown to have made upon the roof and other work which should have been made and done by defendant Morris.    In conclusion, the court held that the conduct of plaintiff Lamar after March 1, 1920, up to the time defendant entered into the contracts of sale with defendants Davis and Stricker was not such as entitled him to the relief of specific performance in a court of equity, dissolved his preliminary injunction and dismissed his bill, without, however, prejudice to any action at law which he might be entitled to under circumstances shown.

We find no occasion to discuss the technical questions of law raised or review the cases cited by appellant.    Specific performance is not a remedy which may be claimed as a matter of right.    Primarily it rests on the incompleteness or inadequacy of the remedy at law as applied to the contract sought to be specifically enforced under the facts shown.    The provisions of this contract pertinent here are plain and unambiguous.    Plaintiff's initial error was assuming that defendant's obligation to finish construction, grade and sod the lawn, etc., as quoted, was a condition precedent to his making his second payment of $2,500 on March 1, 1920.    No time for performance of those obligations is fixed.    But the time for plaintiff's second payment is fixed positively without qualification, at a time prior to which complete performance of defendant's obligations was impossible.    So far as the record discloses, the cost of those improvements and repairs as to which defendant is claimed to be in de-

fault would amount to between $500 and $600. This contract made on January 8, 1920, was for the purchase of valuable real estate, at a price of $25,000. Upon this plaintiff paid down but $500, agreeing unconditionally to pay $2,500 more on March 1, 1920, and quarterly payments of $600 thereafter. He made no further payment on the remaining $24,500 of purchase price and refused to do so for the reason above stated, but assuming to be owner of the property he listed it with a real estate agency for sale. Through tentative negotiations he received a deposit of $300, which is not shown to have been returned to the prospective purchaser, apparently leaving his net investment in his $25,000 contract but $200. So far as shown, he never took possession of the property, collected rent from it or assumed any control over it. He learned that the property was sold by defendant to other innocent purchasers about the last of May, 1920. Shortly after being advised of that fact he made a claimed tender of $2,500. At that time a further payment of $600 was past due on the contract. He is not shown to have done anything further in regard to the matter until he commenced this suit the following fall. Plaintiff was early cognizant of the fact defendant had made sales of the property to other innocent parties and could not, therefore, make specific performance to him.

"Where specific performance was impossible at the time of the commencement of the suit, and plaintiff knew or was informed at that time of the impossibility, the court, on denying the equitable relief, will not retain the case for the purpose of awarding damages, but will leave him to his legal remedy." 36 Cyc. p. 747.

We find no occasion to disturb the conclusions of the lower court that the circumstances of this case disclose no appealing equities which demand or warrant in subservience to the ends of justice the equitable re-

lief asked by plaintiff, but leaving him to his legal remedies, if any.

The decree will stand affirmed, with costs to defendant.

SHARPE, C. J., and BIRD, SNOW, FELLOWS, WIEST, CLARK, and McDONALD, JJ., concurred.