RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 07a0482p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

JPMORGAN CHASE BANK, N.A., as Administrative Agent,

        *Plaintiff - Appellee,*

     *v.*

LARRY J. WINGET and the LARRY J. WINGET LIVING TRUST,

        *Defendants-Appellants.*

No. 07-1096

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-74141—Avern Cohn, District Judge.

Argued: November 1, 2007

Decided and Filed: December 14, 2007

Before: SILER, MOORE, and GILMAN, Circuit Judges.

---

### COUNSEL

**ARGUED:** John E. Anding, DREW, COOPER & ANDING, Grand Rapids, Michigan, for Appellants. Melville W. Washburn, SIDLEY AUSTIN, Chicago, Illinois, for Appellee. **ON BRIEF:** John E. Anding, Thomas V. Hubbard, DREW, COOPER & ANDING, Grand Rapids, Michigan, for Appellants. Melville W. Washburn, Matthew A. Clemente, Larry J. Nyhan, Kevin C. Pecoraro, Brian D. Rubens, SIDLEY AUSTIN, Chicago, Illinois, William T. Burgess, DICKINSON WRIGHT, Detroit, Michigan, for Appellee.

---

### OPINION

---

RONALD LEE GILMAN, Circuit Judge. Through a series of transactions between 1999 and 2002, JPMorgan Chase Bank and its predecessor served as agent for a number of lenders that had advanced credit to Venture Holding Company LLC, a company owned by Larry J. Winget and the Larry J. Winget Living Trust (hereafter collectively referred to as Winget). JPMorgan, on the basis of the various agreements between the parties, sought to inspect the financial records of two other companies owned by Winget after Venture filed for bankruptcy. The district court granted JPMorgan's request for specific performance of the bank's inspection rights, a decision that Winget has appealed. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

1

## I. BACKGROUND

### A.     Factual background

#### 1.     *The parties' relationship*

In October of 2002, JPMorgan and Winget entered into the Eighth Amendment of the Credit Agreement between the lenders and Venture.  A guaranty of payment (Winget Guaranty) was executed pursuant to the Eighth Amendment, which memorialized Winget's personal guarantee of Venture's obligations under the Credit Agreement.  Winget also entered into two pledge agreements (Winget Pledges) in conjunction with the Winget Guaranty, whereby Winget pledged all of the present and future stock in two other companies owned by Winget—P.I.M. Management Co. (P.I.M.) and Venco #1, LLC (Venco).   Finally, P.I.M. and Venco executed guaranties that were similar to the Winget Guaranty and the Winget Pledges (P.I.M. Guaranty and Venco Guaranty).

Venture and a number of Winget's other companies later filed for bankruptcy.  Following the sale of various assets of the bankrupt companies, Venture's outstanding debt under the Credit Agreement stood at approximately $350 million.  On September 21, 2005, JPMorgan, through its counsel, sent a letter to Winget requesting inspection of his personal financial records and the financial records of P.I.M. and Venco pursuant to the terms of the Winget Guaranty.  Winget, on October 5, 2005, denied JPMorgan's request.

#### 2.     *Relevant contractual provisions*

At issue in this appeal is the inspection covenant set forth in § 11(d)(i) of the Winget Guaranty.  This section provides in pertinent part as follows:

> Each of the Guarantor Controlled Companies will permit the Administrative Agent, by its representatives and agents, to inspect any of the Property, corporate books and financial records of such Guarantor Controlled Company, . . . to examine and make copies of the books and accounts and other financial records of such Guarantor Controlled Company, and to discuss the affairs, finances and accounts of such Guarantor Controlled Company with, and to be advised as to the same by, their respective officers at such reasonable times and intervals as the Administrative Agent may designate . . . .

This inspection covenant is one of a series of covenants that govern the actions that may be taken with respect to Winget's companies, including P.I.M. and Venco.  These covenants include restrictions on (1) the declaration and payment of dividends (§ 11(d)(ii)), (2) the incurring of indebtedness (§ 11(d)(iii)), (3) mergers and consolidations (§ 11(d)(iv)), (4) investments and acquisitions (§ 11(d)(v)), (5) the creation of liens (§ 11(d)(vi)), and (6) transactions with specific affiliated entities (§ 11(d)(vii)).  The Winget Guaranty states that Winget "will cause the Guarantor Controlled Companies to comply with each of the . . . covenants."

Another portion of the Winget Guaranty that is relevant to this appeal is § 3, which sets out the limits on JPMorgan's potential recovery under the Credit Agreement:

> [N]o action will be brought for the repayment of the Guaranteed Obligations under this Guaranty and no judgment therefor will be obtained or enforced against Larry Winget other than with respect to the Pledged Stock in accordance with the provisions of the related pledge agreements, provided that the Guarantor shall be fully and personally liable for any damages arising from any violations of any of the agreements of the Guarantor herein in favor of the Lenders.  No action for money judgment shall be commenced by the Administrative Agent arising from any alleged

violation of the covenants contained in Section 11(d) until the completion of collection and liquidation efforts (as described in Section 5.2 of the Pledge Agreement of Guarantor as to PIM), unless there is a good faith allegation of material and irreparable harm. However, an action for specific performance and/or injunctive relief can be brought at any time following an alleged violation.

Although § 3 of the Winget Guaranty references only the P.I.M. Pledge, § 5.2 of both the P.I.M. Pledge and Venco Pledge contain identical language regarding any collection action against the pledged stock. These sections provide in pertinent part that

> [n]otwithstanding anything herein or elsewhere to the contrary, the Agent shall not exercise any rights or remedies under this Pledge Agreement until all reasonable efforts have been made by it to collect the Obligations from other collateral held by the Agent . . . , it being intended that the Collateral provided by this Pledge Agreement . . . shall be realized upon by the Agent only as a last resort.

The "other collateral" that must first be pursued by JPMorgan is not defined in the Winget Guaranty, but the pledged stock of P.I.M. and Venco are explicitly excluded from the contemplated "other collateral." An almost identical "reasonable efforts" provision appears in § 3(iii) of both the P.I.M. and Venco Guaranties. Finally, pursuant to § 10 of the Winget Pledges, Winget can obtain a release of the P.I.M. and Venco stock by paying JPMorgan "not less than $50,000,000" to satisfy each pledge.

## B.     Procedural background

In Count I of the Complaint, JPMorgan requests an order for specific performance under the Winget Guaranty, requiring Winget to comply with the inspection requests outlined in its September 21, 2005 letter. Winget filed both an Answer, raising affirmative defenses, and a Counterclaim, which was subsequently amended. JPMorgan moved to dismiss the amended Counterclaim. The district court eventually dismissed the Counterclaim without prejudice and permitted Winget to assert those claims in a new, related case, which Winget did.

JPMorgan then moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. In its motion, JPMorgan sought to have Winget's affirmative defenses stricken and requested a final judgment as to its request for specific performance. The district court granted JPMorgan's request for specific performance and ruled that the affirmative defenses would be litigated as part of the companion case initiated on the basis of Winget's former Counterclaim.

At the request of the district court, both parties submitted proposed orders that would implement the specific performance of JPMorgan's inspection right. JPMorgan's proposed order was adopted, which the district court subsequently modified to protect Winget's right to assert his Fifth Amendment privilege against self incrimination in other proceedings. The district court also entered a protective order that restricts the use of any confidential material produced during the inspection process. On appeal, Winget argues that the district court erred by (1) failing to apply the "reasonable efforts" provision to JPMorgan's inspection rights, and (2) granting an overly broad order of specific performance.

## II.  ANALYSIS

## A.     Standard of review and applicable substantive law

We review de novo a judgment on the pleadings granted pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, using the same standard as applies to a review of a motion to dismiss under Rule 12(b)(6). *Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC*, 477 F.3d 383,

389 (6th Cir. 2007). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *Southern Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 479 F.2d 478, 480 (6th Cir. 1973). But we "need not accept as true legal conclusions or unwarranted factual inferences." *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999). A Rule 12(c) motion "is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991).

Jurisdiction in the present case is based on diversity of citizenship. "In diversity cases such as this, we apply state law in accordance with the controlling decisions of the state supreme court." *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001). Accordingly, we apply Michigan state law to the interpretation of the parties' agreements and the district court's order of specific performance.

## B.     The "reasonable efforts" provision

Winget contends that JPMorgan's inspection rights as set forth in § 11(d) of the Winget Guaranty are subject to the "reasonable efforts" provisions of the Winget Pledges, P.I.M. Guaranty, and Venco Guaranty. He advances this contention by arguing that the district court misapplied the legal standard applicable to a judgment on the pleadings. According to Winget, "[u]nder 12(c), this Court must accept as true [his] allegation that [JPMorgan] failed to use 'all reasonable efforts' to obtain payment of the Guaranteed Obligations from the other collateral." Winget also claims that "in the context of [JPMorgan's] Rule 12(c) motion, the district court was required to accept as true, given the state of the pleadings, that [JPMorgan] was contractually barred from taking action that would affect the rights of Venco and P.I.M."

We conclude that Winget's argument is both a misapprehension of the proper analysis under Rule 12(c) and an incorrect interpretation of the language of the Winget Guaranty. Although "all well-pleaded material allegations of the pleadings of the opposing party must be taken as true," *Southern Ohio Bank*, 479 F.2d at 480, Winget's assertion that JPMorgan was contractually barred from exercising its inspection rights until it satisfied the "reasonable efforts" provision is a legal conclusion, not a factual allegation. Accordingly, we are not required to accept Winget's argument as true. *Mixon*, 193 F.3d at 400. Winget repeatedly asserts that the district court erred because it failed to accept his contention that JPMorgan had not used all "reasonable efforts" before seeking to exercise its inspection rights. In fact, the district court made no such error, because the court actually concluded that the "reasonable efforts" provision was inapplicable to JPMorgan's inspection rights as Agent.

The proper interpretation of a contract is a question of law. *Archambo v. Lawyers Title Ins. Corp.*, 646 N.W. 2d 170, 174 (Mich. 2002). Thus, whether the "reasonable efforts" provisions of the P.I.M. Guaranty and the Venco Guaranty are applicable to the Agent's inspection rights under the Winget Guaranty is a legal question that may be decided on a motion for judgment on the pleadings. According to Winget, § 3(iii) of the P.I.M. and Venco Guaranties limit JPMorgan's inspection rights under § 11(d) of the Winget Guaranty. Section 3(iii) provides that JPMorgan "shall not exercise any rights or remedies under this Guaranty until all reasonable efforts shall have been made by it to collect the Guaranteed Obligations from other collateral held by the Administrative Agent." Winget argues that because JPMorgan has failed to demonstrate that it has made "all reasonable efforts" to collect from other collateral, it cannot exercise its inspection rights as Agent.

The numerous, interrelated contracts governing the relationship between Winget and JPMorgan are undoubtedly complex, and JPMorgan's ability to seek certain forms of relief is circumscribed by the provisions of the various agreements. For example, § 3 of the Winget

Guaranty provides that "[n]o action for money judgment shall be commenced by the Administrative Agent arising from any alleged covenants contained in Section 11(d) until the completion of collection and liquidation efforts (as described in Section 5.2 of the Pledge Agreement of Guarantor as to PIM), unless there is a good faith allegation of material and irreparable harm." If JPMorgan were seeking a money judgment based on Winget's response to its request to inspect the financial records, this provision makes clear that JPMorgan must first complete the "collection and liquidation efforts" set forth in § 5.2 and make a good-faith allegation of material and irreparable harm.

The language related to JPMorgan's inspection rights, in contrast, is consistent, unambiguous, and not circumscribed by any similar limitation. The Winget Guaranty, the P.I.M. Guaranty, and the Venco Guaranty each unequivocally state that, with respect to the inspection rights, "an action for specific performance and/or injunctive relief can be brought at any time following an alleged violation." Winget argues that we must look to the intention of the parties, and that the intention of the parties is clear from the contractual language. He specifically relies on § 3(iii) of both the P.I.M. and Venco Guaranties, where the parties state that they "intended that this Guaranty and the collateral provided by the Pledge Agreement from the Guarantor . . . shall be realized upon by the Administrative Agent only as a last resort."

In other words, Winget contends that JPMorgan may seek recovery from P.I.M. and Venco only if no other assets are reasonably available. But JPMorgan is not seeking recovery from P.I.M. and Venco. Rather, JPMorgan is simply seeking to exercise its right to inspect the financial records of those two companies, a right that it may exercise through an action for specific performance "at any time following an alleged violation." Here the alleged violation is Winget's denial of JPMorgan's request, sent by letter in September of 2005, to inspect the financial records of P.I.M. and Venco.

Moreover, the Winget Guaranty, upon which the instant action is based, contains no "reasonable efforts" provision and no reference to recovery as a last resort. The absence of a "reasonable efforts" provision is a compelling indication that the parties did not intend that any of JPMorgan's inspection rights under the Winget Guaranty would be circumscribed by such a requirement. This interpretation is consistent with the stated intention of the P.I.M. and Venco Guaranties that recovery must first be sought from other assets owned or controlled by Winget.

Because the last sentence of § 3 of the Winget Guaranty explicitly permits JPMorgan to exercise its inspection rights under § 11(d)(i) "at any time following an alleged violation," we conclude that the "reasonable efforts" provisions are inapplicable to such rights. JPMorgan was thus entitled to a judgment on the pleadings on this issue.

## C.        The specific performance order

Winget has also raised a number of arguments related to the propriety of specific performance as a remedy for JPMorgan's alleged injury, and he challenges the scope of the district court's order. In particular, he claims that (1) JPMorgan failed to properly plead irreparable harm and "clean hands," (2) JPMorgan has not shown that Winget has the authority to produce the financial records requested for inspection, and (3) the specific-performance order is improper because it entangles the district court in the supervision of the inspection process and is unnecessary because Winget can satisfy his obligations under the agreement through the payment of $50 million.

Winget asserts that "Michigan law is settled that specific performance of a contract requires the plaintiff to allege and prove that it will suffer irreparable harm from a breach such that damages are not an adequate remedy." Because JPMorgan failed to plead irreparable harm, Winget argues, specific performance cannot be granted. This argument, however, misstates the elements of specific performance under Michigan law.

An inadequate remedy at law, not irreparable harm, is what must be alleged and proven in a claim for specific performance. *Laker v. Soverinsky*, 27 N.W.2d 600, 601 (Mich. 1947) ("Specific performance will not be decreed where there is an adequate remedy at law."). Although one of the cases cited by Winget, *Barbers Local 552 v. Sealy*, 118 N.W.2d 837, 839 (Mich. 1962), uses the term "irreparable harm," it uses the term as synonymous with the more commonplace "inadequate remedy at law." *See Lamar v. Detroit Apartments Corp.*, 211 N.W. 643, 645 (Mich. 1927) (explaining that specific performance "rests on the incompleteness or inadequacy of the remedy at law as applied to the contract sought to be specifically enforced under the facts shown").

JPMorgan's Complaint in this case states that

> [s]pecific performance is appropriate and necessary. The Agent will lack an adequate remedy at law if Winget, through his control of P.I.M. and Venco, engages in a liquidation, divestment, sale of assets, or any other course of action or dealing that results in a material diminution of the value of the foreign subsidiaries owned by P.I.M. and Venco. In addition, allegations of misconduct and financial manipulation made in numerous lawsuits currently pending against Winget raise concern as to whether Winget remains in compliance with the covenants referred to in ¶ 29 above. Only through inspection of the records and assets that form the basis of the pledged shares' value can the Agent verify the value of its collateral and ensure that Winget has not violated the covenants contained in the Guaranty or otherwise compromised the pledged collateral and will not do so in the future.

In his Answer, Winget's complete response to the above paragraph is: "Denied as untrue." Winget once again argues that the district court improperly applied the standard for judgment on the pleadings with respect to JPMorgan's assertion and Winget's blanket denial. According to Winget, the district court erred when it "ignor[ed] Winget's denial [and] made the factual finding that specific performance was the 'only way' for the Agent to enforce its 'audit rights.'"

Winget has again misapprehended the proper analysis under Rule 12(c). The issue of whether JPMorgan has an adequate remedy at law that would make specific performance inappropriate is a legal conclusion, not a factual determination. The facts underlying JPMorgan's request for specific performance are generally undisputed. Section 11(d) of the Winget Guaranty contains a number of negative covenants that restrict the actions that can be taken by P.I.M. and Venco during the existence of the Winget Guaranty. JPMorgan is also granted inspection rights in § 11(d) in order to ensure proper compliance with the covenants.

By its letter dated September 21, 2005, JPMorgan sought to exercise its right of inspection. Winget refused the request. These basic facts are alleged in the Complaint and are not refuted. Winget attempts to argue that JPMorgan's letter does not closely track the language of the inspection provisions, but does not elaborate as to how exactly the letter and the provisions differ. In all material respects, we find that the letter properly tracks the language of the inspection provisions. The presence of the negative covenants applicable to Winget's collateral, along with JPMorgan's letter and Winget's response, support the conclusion that specific performance was proper in order to ensure that JPMorgan can properly evaluate the condition of the pledged P.I.M. and Venco stock and ensure compliance with the negative covenants.

In the alternative, Winget argues that any possible harm to JPMorgan arising from a breach of the Guaranty can be remedied through an award of monetary damages. But the only plausible remedy for Winget's failure to allow inspection is to order such inspection. The inspection rights are essential to permit enforcement of the negative covenants listed in § 11(d) of the Winget Guaranty. These covenants govern the collateral pledged by Winget, in the form of guaranties by P.I.M. and Venco, and restrict the actions that can be taken with respect to those entities.

Thus, contrary to Winget's assertion that "the sole right of [JPMorgan] under those documents is to enforce its security interest and apply the proceeds to satisfaction of the Guaranteed Obligations," JPMorgan has an explicit right to inspect the financial records of Winget and the companies he controls in order to ensure that there is sufficient collateral to satisfy Winget's debt if JPMorgan needs to enforce its security interest at a later time. We therefore conclude that JPMorgan lacks an adequate remedy at law to enforce its inspection rights under the Winget Guaranty.

Winget also asserts that specific performance is inappropriate because JPMorgan has failed to demonstrate its "clean hands" in seeking specific performance. In support of this argument, Winget cites to *Rust v. Conrad*, 11 N.W. 265, 267 (Mich. 1882), which states that equitable relief is unavailable

> [i]f the contract is unequal; if he has bought land at a price which is wholly inadequate; if he has obtained the assent of the other party to unreasonable provisions; if there are any indications of overreaching or unfairness on his part, the court will refuse to entertain his case, and turn him over to the usual remedies.

Thus, "one who seeks the aid of equity must come in with clean hands." *Rose v. National Auction Group, Inc.*, 646 N.W.2d 455, 463 (Mich. 2002) (quoting *Stachnik v. Winkel*, 230 N.W.2d 529, 532 (Mich. 1975)).

Winget included specific allegations of unclean hands in both his Answer and in his amended Counterclaim. In his Answer, Winget baldly asserts that "Plaintiff's claims are barred based on unclean hands." The allegations of unclean hands in his amended Counterclaim relate to JPMorgan's actions during the bankruptcy of Venture. As such, these allegations cannot be said to be "willful act[s] concerning the cause of action" presently before the court. *Stachnik*, 230 N.W.2d at 534 (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 815 (1945)). Winget argues that the district court erred in ignoring these allegations in granting judgment on the pleadings, but we conclude that Winget has not actually raised the issue of unclean hands with respect to the specific performance of the inspection rights of the Winget Guaranty.

Another argument briefly raised by Winget is that JPMorgan has not alleged that Winget has any legal right to any of the financial information belonging to P.I.M. and Venco. We find this argument meritless, if not disingenuous. Although Winget is correct in asserting that § 11(d) provides that he will "cause" certain information to be produced, there is no requirement that JPMorgan prove that Winget can actually produce the information. Winget entered into an agreement wherein he promised to cause the production of the requested information from entities that are explicitly referred to as "Guarantor Controlled Companies." The language of the contract speaks for itself. Winget cannot avoid the promise he made by arguing that before receiving judgment on the pleadings, JPMorgan is required to prove that Winget can actually deliver on that promise.

Winget further contends that the order entered by the district court impermissibly involves the court in supervision of the inspection process. Under Michigan law, "[s]pecific performance will not be decreed where enforcement of the decree would require continuous judicial supervision." *Edidin v. Detroit Econ. Growth Corp.*, 352 N.W.2d 288, 291 (Mich. Ct. App. 1984). But the inspection requested by JPMorgan and ordered by the district court does not involve continuous judicial supervision of the kind disfavored by the Michigan courts. For example, Michigan courts have refused to order specific performance of a long-term joint commercial venture, *id.*, or the continued performance of laundry services throughout the term of a lease and its renewal, *Laker v. Soverinsky*, 27 N.W.2d 600, 601 (Mich. 1947). But the inspection in the instant case is more analogous to the limited discovery process commonly undertaken in the district courts. In the cases

cited by Winget, moreover, the trial court determined that its own resources would not be taxed by the relief requested. Similarly, the district court here is in the best position to determine whether it can properly supervise the inspection of the records it has ordered.

An order has already been entered outlining the procedure for production and inspection of the records. The district court has also entered a protective order designed to alleviate Winget's concerns about the misuse of confidential financial data. After carefully reviewing these orders, we conclude that they do not impermissibly embroil the district court in the kind of continuous judicial supervision disfavored by the Michigan courts.

Finally, Winget argues that the district court's order is "vain" because Winget can release the pledged P.I.M. and Venco stock at any time through the payment of $50 million for each pledge. The Michigan Supreme Court has stated that specific performance should not be granted where "one of the parties might nullify its action through the exercise of a discretion which the contract or the law invests him with." *Rust*, 11 N.W. at 267. This standard has been explained as follows:

> In such situations it is obvious, of course, that there are corresponding benefits under the contract flowing from the first party to the second and from the second party to the first, which are parallel, continuous, contemporaneous and co-extensive and that, hence, termination of the contract by either party at any particular time would leave both in substantially status quo ante, thus resulting in no substantial injustice to either party.

*Plastray Corp. v. Cole*, 37 N.W.2d 162, 166 (Mich. 1949).

The party seeking specific performance in *Plastray* had provided a large initial capital outlay in anticipation of a future benefit. "In consequence, termination at any time by defendant might not leave the parties in status quo ante and refusal to grant specific performance would, accordingly, work a hardship and result in an injustice." *Id.* On the other hand, this court has found specific performance inappropriate when "the party requesting specific performance may, through the exercise of discretion, terminate the contract." *Lowe's Home Ctrs., Inc. v. LL & 127, LLC*, 147 F. App'x 516, 524 (6th Cir. 2005) (holding that the district court did not abuse its discretion in denying the plaintiff's request for specific performance where the "agreement [the plaintiff] is seeking to enforce vests [the plaintiff] with the discretion to avoid performing under certain circumstances").

JPMorgan requested the order of specific performance but, unlike the plaintiff in *Lowe's*, it does not have the discretion to avoid performing under the Guaranty. *Id.* Rather, the present case is more analogous to *Plastray*. 37 N.W.2d at 166. JPMorgan provided a significant initial capital outlay in anticipation of future repayment by Winget. Moreover, Winget's exercise of his partial buyout option by paying $50 million per pledge "might not leave the parties in status quo ante." *See id.* In order to not "work a hardship . . . result[ing] in an injustice," we conclude that the specific-performance order is not "vain." *See id.*

### III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.