NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0330n.06

No. 21-5909

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Aug 11, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| ULTRAFOG, LTD., | ) | |
| Plaintiff - Appellant, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY |
| v. | ) ) | |
| ORR PROTECTION SYSTEMS, INC., | ) ) | OPINION |
| Defendant - Appellee. | ) ) ) | |

Before: CLAY, GRIFFIN, and WHITE, Circuit Judges.

WHITE, J., announced the judgment and delivered the opinion of the court in which CLAY and GRIFFIN, JJ., joined in different parts. CLAY, J. (pp. 17–23), delivered a separate opinion concurring in Section II.D. and dissenting from the remainder of the lead opinion. GRIFFIN, J. (pp. 24–27), delivered a separate opinion concurring in the lead opinion except as to the introductory paragraph, Section II.D., and Section III.

HELENE N. WHITE, Circuit Judge. In this breach-of-contract action, Plaintiff-Appellant Ultrafog, Ltd. ("Ultrafog") appeals the grant of judgment on the pleadings to Defendant-Appellee Orr Protection Systems, Inc. ("ORR"), arguing that it adequately stated a claim for breach of contract and that the existence of material issues of fact rendered the district court's judgment premature. We **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings.

**I.**

This dispute concerns a project to rehabilitate the Hugh L. Carey Tunnel (formerly known as the Brooklyn-Battery Tunnel) in New York City. Navillus was hired by the New York Triborough Bridge and Tunnel Authority as the primary contractor for the project, which included

updating the tunnel's fire suppression system.  Around July 2018, Navillus invited ORR to submit

a proposal to provide design-build services related to the tunnel's ventilation and fire suppression

systems.  The next month, Navillus and ORR engaged in preliminary discussions to the effect that,

if Navillus retained ORR as a subcontractor, ORR would retain Ultrafog as a sub-subcontractor.

On March 22, 2019, Ultrafog submitted a formal proposal to ORR.  On April 9, 2019, Navillus

issued a letter of intent to retain ORR as a subcontractor for the project.  On April 11, 2019, before

ORR and Navillus formalized their relationship, ORR submitted a purchase order to Ultrafog.  In

that purchase order, Ultrafog agreed to provide design drawings, calculations, and tunnel test

engineering support for the project.  In June 2019, Navillus and ORR executed a subcontract

agreement (the "Prime Contract").  On July 2, 2019, ORR submitted a second purchase order to

Ultrafog for the "remaining balance" of the fire-suppression system for the project.  R.1, PID 4 (¶

16).[1]

Each purchase order stated that it was subject to ORR's Terms and Conditions.  The Terms

and Conditions apply to "all Work (as defined below) purchased by [ORR] and performed by any

recipient of an ORR Purchase Order ("Subcontractor")."  R.1-7, PID 303 (¶ 1).  The Terms and

Conditions define "Work" as follows:

> 2. **Work**. Subcontractor shall perform the services as detailed in the Purchase Order and as provided herein, including any fire detection/suppression or related activity (collectively the "Work"), in a good, timely and workmanlike manner.  It shall be the responsibility of Subcontractor to examine, review and understand the Purchase Order relating to the Work (including the services and materials to be provided by Subcontractor), and it shall further be the responsibility of Subcontractor to familiarize itself with all conditions which may affect the Work.  In performing the Work and as applicable to the Work, Subcontractor agrees to assume and be bound to ORR by the same duties, obligations and responsibilities as ORR is to the general contractor and owner (collectively "Owner") under the agreement between ORR and the Owner (the "Prime Contract") of the applicable site where the Work will be performed (the "Work Site").  In the event of a conflict between this Subcontract and the Prime Contract, the provisions imposing the greater duty, obligation and

---

[1] There was a total of four purchase orders between ORR and Ultrafog.

responsibility on Subcontractor shall govern in all respects.  Accordingly, Subcontractor agrees to be bound to ORR to perform the Work under the terms and conditions of the Prime Contract.

*Id.*, PID 303–04 (¶ 2).

The Terms and Conditions also contain the following provisions regarding default and early termination, the meaning and applicability of which the parties dispute on appeal:

16. **Default of Subcontractor**.  Should Subcontractor at any time (a) breach this Agreement, a Purchase Order or its obligations pursuant to the Prime Contract; (b) cause stoppage or delay of or interference with the Project, or any portion thereof; or (c) become insolvent, then, in any such event, each of which shall constitute a default hereunder by Subcontractor, ORR shall, after giving Subcontractor written notice of default and forty-eight (48) hours within which to cure such default, have the right to exercise any one or more of the following remedies: a. Require that Subcontractor utilize, at its own expense, overtime labor (including Saturday and Sunday work), in additional shifts as necessary to overcome the consequences of any delay attributable to Subcontractor's default; and/or b. Attempt to remedy the default by whatever means ORR may deem necessary or appropriate, including, without limitation, correcting, furnishing, performing or otherwise completing the Work, or any portion thereof, by itself or through others (utilizing where appropriate any materials and equipment previously purchased for that purpose by Subcontractor) and deducting the cost thereof (plus an allowance for administrative costs equal to twenty percent (20%) of such costs) from any monies due or that become due to Subcontractor hereunder.

17. **Early Termination**.  Either party may immediately terminate this Agreement if the other party fails to cure any material breach of this Agreement within thirty (30) days after receipt of written notice of such breach from the other party.  B.  If Owner terminates the Prime Contract, or stops the Work for a reason other than the sole default of ORR, ORR may immediately terminate this Agreement or stop the Work for the same reason, and Subcontractor's rights and remedies, including payment of any unpaid and earned portion of the Price, shall be limited to the corresponding rights and remedies available to ORR under the Prime Contract.

*Id.*, PID 307–08 (¶¶ 16–17).

Ultrafog ordered equipment and performed services to satisfy the requirements of the purchase orders.  During this time, employees from Navillus, ORR, and Ultrafog participated in weekly meetings via telephone.  ORR did not object to Ultrafog's work and made a partial payment of $459,600 for the services Ultrafog performed toward the purchase orders.

On February 20, 2020, Navillus sent a letter to ORR "request[ing] ORR to terminate Ultrafog from the Project with immediate effect." R.1-10, PID 346. In its letter, Navillus asserted that Ultrafog had "caused the design process on the Project to become inefficient & inadequate" for a number of reasons, including inadequate staffing, failure to follow schedules, and fire testing and certification issues. *Id.*, PID 345–46. It further stated that "should Navillus incur any additional cost as a result of this termination and/or Ultrafog's failure to perform on the Project as required," ORR would be responsible to Navillus for such costs. *Id.*, PID 346. On March 3, 2020, ORR notified Ultrafog in writing that Navillus had decided to terminate Ultrafog from the project. It invoked Section 17 of the Terms and Conditions and requested that Ultrafog stop all work related to the purchase orders and cancel any pending purchase orders.

Ultrafog sued ORR, asserting a single claim for breach of contract. It alleged that ORR "breached Section 17 of the Terms and Conditions by improperly and immediately terminating Ultrafog from the Project and cancelling all outstanding Purchase Orders." R.1, PID 9. ORR moved for judgment on the pleadings, arguing that Section 17b explicitly permitted it to immediately terminate the purchase orders upon Navillus's termination of the Prime Contract or its stoppage of the "Work" as defined in the Terms and Conditions.

Ultrafog argued in response that ORR was not entitled to invoke Section 17b because the parties' dispute concerned an alleged default by Ultrafog. Instead, it asserted, Section 16 and the first clause of Section 17, which provide for notice and an opportunity to cure after an alleged breach or default, governed the parties' dispute. It further argued that Navillus had not actually stopped the Work, having only requested that ORR terminate Ultrafog from the project. And, even if Navillus had stopped the Work, because ORR was ultimately responsible for Ultrafog's work under the Prime Contract and the Terms and Conditions, the alleged Work stoppage was due to

-4-

the "sole" default of ORR, making Section 17b inapplicable. At the very least, Ultrafog contended, the district court should grant discovery to "determine the reasoning for any purported order to stop the Work," noting that "the facts suggest that ORR's default was the true reason" for the stoppage of the Work. R.11, PID 409.

The district court granted ORR's motion for judgment on the pleadings. It held that ORR had properly invoked Section 17b's early termination provision. It also rejected Ultrafog's contention that Navillus had not stopped the Work, finding that Navillus was not required to "order" a stop to the Work, as Ultrafog had suggested. The district court reasoned that Navillus had stopped the Work by requesting that Ultrafog be terminated from the project. Finally, the district court rejected Ultrafog's argument that any stoppage of the Work was due to the sole default of ORR because ORR was responsible for Ultrafog's work under the Prime Contract, observing that Section 9 of the Terms and Conditions required Ultrafog to perform its work to the satisfaction of both Navillus and ORR. Thus, the district court concluded, ORR did not bear "sole responsibility" for Ultrafog's work. R.15, PID 452. The district court did not address Ultrafog's request for discovery or its assertion that genuine issues of material fact remained regarding ORR's responsibility.

This appeal followed.

## II.

### A.

"We review de novo a judgment on the pleadings under Federal Rule of Civil Procedure 12(c), applying the same standard we apply to review the grant of a motion to dismiss under Rule 12(b)(6)." *Jackson v. City of Cleveland*, 925 F.3d 793, 806 (6th Cir. 2019). Accordingly, we ask whether the "complaint . . . contain[s] sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'" *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 252 (6th Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Although our decision rests primarily upon the allegations of the complaint, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint[] also may be taken into account." *Barany-Snyder v. Weiner*, 539 F.3d 327, 332 (6th Cir. 2008) (internal quotation marks omitted). In conducting our review, we "must construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). However, we "need not accept as true legal conclusions or unwarranted factual inferences." *Jackson v. Pro. Radiology Inc.*, 864 F.3d 463, 466 (6th Cir. 2017) (quoting *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999)).

**B.**

Ultrafog first argues that the district court erred in granting judgment on the pleadings to ORR by "impermissibly enlarging the scope of Section 17's early termination mechanism and depriving Ultrafog of its rights" to notice and opportunity to cure set forth in Section 16 and the first clause of Section 17. Appellant Br. at 23. It contends that in finding that ORR validly invoked Section 17b's early termination provision, the district court "excised key language from Sections 16 and 17" and essentially granted Navillus an unfettered, unilateral right to terminate Ultrafog for any reason. *Id.* at 24, 26. We disagree.

Our review begins with an examination of the plain language of the contract. *Mostert v. Mostert Grp., LLC*, 606 S.W.3d 87, 91 (Ky. 2020).[2] A contract must be "construed as a whole, giving effect to all parts and every word in it if possible." *Big Sandy Co., L.P. v. EQT Gathering, LLC*, 545 S.W.3d 842, 845 (Ky. 2018) (quoting *City of Louisa v. Newland*, 705 S.W.2d 916, 919

---

[2] The choice of law provision provides that the Terms and Conditions are governed by Kentucky law.

(Ky. 1986)). "'In the absence of ambiguity, a written instrument will be enforced strictly according to its terms,' and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Ky. Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016) (quoting *Wehr Constructors, Inc. v. Assurance Co. of Am.*, 384 S.W.3d 680, 687 (Ky. 2012)). "A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." *Id.* at 694–95 (quoting *Hazard Coal Corp. v. Knight*, 325 S.W.3d 290, 298 (Ky. 2010)). "The fact that a party may have intended different results is inadequate to 'construe a contract at variance with its plain and unambiguous terms.'" *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 784 (Ky. 2017) (quoting *3D Enters. Contracting Corp. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005)).

The relevant Terms and Conditions, reproduced here for convenience, provide:

16. **Default of Subcontractor**. Should Subcontractor at any time (a) breach this Agreement, a Purchase Order or its obligations pursuant to the Prime Contract; (b) cause stoppage or delay of or interference with the Project, or any portion thereof; or (c) become insolvent, then, in any such event, each of which shall constitute a default hereunder by Subcontractor, ORR shall, after giving Subcontractor written notice of default and forty-eight (48) hours within which to cure such default, have the right to exercise any one or more of the following remedies . . . .

17. **Early Termination**. Either party may immediately terminate this Agreement if the other party fails to cure any material breach of this Agreement within thirty (30) days after receipt of written notice of such breach from the other party. b. If Owner terminates the Prime Contract, or stops the Work for a reason other than the sole default of ORR, ORR may immediately terminate this Agreement or stop the Work for the same reason, and Subcontractor's rights and remedies, including payment of any unpaid and earned portion of the Price, shall be limited to the corresponding rights and remedies available to ORR under the Prime Contract.

R.1-7, PID 307–08 (¶¶ 16–17).

Ultrafog begins with the premise that Section 16 and the first clause of Section 17 are the operative provisions of the Terms and Conditions because Navillus's February 20, 2020, letter to

ORR concerned Ultrafog's alleged defaults. It argues that these provisions entitled it to notice and an opportunity to cure, which ORR failed to provide, and that the district court's order permitting Ultrafog's immediate termination under Section 17b, without the required notice and opportunity to cure, negated these provisions and failed to give effect to the full language of the contract.

But as we read the Terms and Conditions, Section 16 and the first clause of Section 17 are independent of Section 17b and apply under different—though not necessarily mutually exclusive—scenarios. Section 16 provides that in the event of a default by the "Subcontractor," here, Ultrafog, ORR shall provide Ultrafog with notice and an opportunity to cure the default. After ORR provides such notice and opportunity to cure, Section 16 empowers ORR to exercise various remedies short of termination. The first clause of Section 17, which again applies to ORR and Ultrafog, provides that in the event either party fails to cure a material breach of "this Agreement," defined as "[t]hese Purchase Order Terms and Conditions," R.1-7, PID 303 (¶ 1), within the thirty days allowed for cure, the other party may terminate the Agreement.

Section 17b, by contrast, is not conditioned on a breach, default, or failure to cure on the part of either ORR or Ultrafog, but on two possible actions taken by the "Owner," here, Navillus. Those two discrete actions are Navillus's termination of the Prime Contract and its stoppage of the Work for a reason other than ORR's sole default. If Navillus takes such action, the Terms and Conditions permit ORR to "terminate this Agreement or stop the Work for the same reason." R.1-7, PID 308 (¶ 17). As written, Section 17b places no qualification on Navillus's triggering action, except that Navillus cannot have acted by reason of ORR's sole default. Likewise, it contains no limitation on ORR's right to terminate the Agreement or stop the Work for the same reason.

Thus understood, the district court's order does not "read out" the notice and cure provisions in Sections 16 and 17. Rather, its interpretation simply acknowledges that the Terms

and Conditions recognize that Navillus might terminate the Prime Contract or stop the Work and that if that happens, Section 17b applies.[3]

Ultrafog argues nevertheless that "Section 17(b) cannot apply to the very same default(s) that Section 16 was intended to govern." Reply Br. at 10. But this possibility is contemplated by the Terms and Conditions. Section 17b, by its plain terms, contains no limitation on the circumstances of Navillus's terminating the Prime Contract or stopping the Work (save for the proviso regarding ORR's sole default). Similarly, it explicitly allows ORR to "*immediately terminate*" the Agreement or stop the Work "for the same reason" as Navillus, with no exclusions for default or breach by Ultrafog and no reference to notice or cure obligations. R.1-7, PID 308 (¶ 17) (emphasis added). Despite Ultrafog's attempt to characterize this result as internally inconsistent or contradictory, Sections 16 and 17 are easily harmonized by recognizing that Section 17b's early termination provision is triggered solely by actions taken by Navillus, but Section 16 and the first clause of Section 17 are not. Absent any action by Navillus, ORR would, in the event of a default by Ultrafog, be bound by the notice and cure provisions in Section 16. Accordingly, we find Ultrafog's argument that the district court failed to give full effect to the Terms and Conditions unpersuasive.

Ultrafog also argues that the district court's construction of Sections 16 and 17 "grants Navillus an unfettered right to immediately terminate Ultrafog for *any* alleged breach, no matter how easily curable." Appellant Br. at 27. It contends that this "absurd result" is a "far cry" from

---

[3] We note that neither Navillus nor ORR has taken the explicit position that Ultrafog was in default, as Ultrafog appears to concede in its opening brief. *See* Appellant Br. at 22 ("Assuming the alleged inadequacies and inefficiencies recited in Navillus's February 20th Letter—some of which do not appear within the scope of the Work Ultrafog was to perform—constituted 'material breaches' of its contract with ORR, then the Terms and Conditions mandate that Ultrafog be afforded an opportunity to cure said default(s) after being provided with written notice thereof.") (internal citation omitted). Indeed, ORR's notice of termination to Ultrafog does not use the words "breach" or "default," stating instead that ORR is terminating Ultrafog because it has "been informed by Navillus Contracting of its decision to terminate [Ultrafog] from the Hugh Carey Tunnel Project." R.1-9, PID 343.

the parties' intentions. *Id.* Ultrafog notes, for example, that in addition to Sections 16 and 17 of the Terms and Conditions, Article XI of the Prime Contract contains a notice and cure mechanism requiring Navillus to provide three days' written notice in the case of a default by ORR before exercising its remedies. As such, it concludes, "[i]f Navillus cancels the Prime Contract, it is similarly required to provide notice prior to doing so." Reply Br. at 8.

But as previously discussed, the language of Section 17b plainly treats Navillus's action as triggering ORR's discretion to terminate the Agreement or stop the Work for the same reason, except ORR's sole default. Although Ultrafog may not like this outcome, we are not at liberty to construe the parties' contract in a manner contrary to its terms merely because Ultrafog intended a different result. *See Ky. Shakespeare Festival, Inc.*, 490 S.W.3d at 695 ("The fact that one party may have intended different results, however, is insufficient to construe a contract at variance with its plain and unambiguous terms.") (quoting *Abney v. Nationwide Mut. Ins. Co.*, 215 S.W.3d 699, 703 (Ky. 2006)); *see also Plaza Condo. Ass'n, Inc. v. Wellington Corp.*, 920 S.W.2d 51, 54 (Ky. 1996) (stating that "it is not the function of the judiciary to change the obligations of a contract which the parties have seen fit to make.") (quoting *O.P. Link Handle Co. v. Wright*, 429 S.W.2d 842, 847 (Ky. 1968)). The language of Section 17b explicitly contemplates that Navillus might take action triggering ORR's rights under that section under circumstances not involving a demand to cure. We also reject Ultrafog's argument, not made below, that Article XI of the Prime Contract requires Navillus to provide notice and an opportunity to cure before terminating Ultrafog from the project. Whatever obligations Navillus may have owed to ORR by virtue of the Prime Contract, those same provisions do not govern Navillus's obligations to Ultrafog.[4]

---

[4] Ultrafog argues that because Section 2 of the Terms and Conditions provides that Ultrafog "agrees to assume and be bound to ORR by the same duties, obligations and responsibilities as ORR is to the general contractor and owner . . . under the [Prime Contract]," R.1-7, PID 304, the same notice and cure obligations in Article XI of the Prime

For these reasons, we conclude that the district court's interpretation of Section 17b of the Terms and Conditions did not amount to "an impermissible revision of the parties' agreement." Appellant Br. at 28.

**C.**

Ultrafog next argues that even if Section 17b's immediate termination provision applies, Navillus's February 20, 2020, letter to ORR did not unequivocally stop the Work on the project. Rather, Ultrafog argues, Navillus merely requested that ORR terminate it from the project. We are not persuaded.

Ultrafog's argument might be plausible were it not for the fact that the Terms and Conditions define "Work" as "the services as detailed in the Purchase Order and as provided herein, including any fire detection/suppression or related activity (collectively the "Work)." R.1-7, PID 303. The purchase orders governing the relationship between ORR and Ultrafog provided that Ultrafog would provide design drawings, calculations, and tunnel test engineering support, among other services. By requesting that Ultrafog be terminated from the project with immediate effect, Navillus ordered a stop to the "Work" as defined by the Terms and Conditions because Ultrafog participated in the project solely by virtue of the purchase orders. Those purchase orders were issued specifically to Ultrafog and set out specific tasks for Ultrafog to complete. Ultrafog's termination from the project ended the "Work" as defined by the Terms and Conditions and purchase orders. Further, nothing in the Terms and Conditions required Navillus to employ certain words to trigger ORR's ability to terminate the Agreement or stop the Work under Section 17b.

---

Contract bind Navillus with respect to Ultrafog. But Article XI imposes notice and cure obligations on Navillus toward ORR, not the other way around. Section 2 of the Terms and Conditions therefore does not support Ultrafog's argument.

Ultrafog also argues that Navillus's admonition, in its February 20, 2020, letter, that ORR would be responsible for Navillus's "additional cost as a result of this termination *and/or Ultrafog's failure to perform on the Project as required*," R.1-10, PID 346 (emphasis added), suggests that Ultrafog was to remain on the project for some time after Navillus requested its termination. Thus, in Ultrafog's view, its Work on the project did not actually stop. This argument, too, is unpersuasive. The language from Navillus's letter on which Ultrafog relies is clearly a reference to asserted inefficiencies and inadequacies that Navillus attributed to Ultrafog earlier in its letter. And, as ORR points out, when read in the context of Navillus's request to ORR to terminate Ultrafog from the project "with immediate affect," along with its reference to additional costs "as a result of this termination," Ultrafog's interpretation of Navillus's letter is not reasonable. *Id.*

In further support of its contention that Navillus did not actually stop the Work, Ultrafog argues that Navillus "simply substituted another subcontractor in place of Ultrafog to perform various work related to the fire suppression system." Appellant Br. at 29. It notes that after it was purportedly terminated from the project, a company called FOGTEC issued a press release stating that it had been awarded a contract to install a "full scale fire tested water mist system" in connection with the project to rehabilitate the Hugh L. Carey Tunnel. R.11-1, PID 416–17. The record before the district court, it observes, does not indicate whether the work FOGTEC performed was "identical" to that performed by Ultrafog. Appellant Br. at 29.

We need not delve into the specifics of FOGTEC's work on the project, because, as discussed, "Work" is a specifically defined term under Section 2 of the Terms and Conditions. It refers to "the services *as detailed in the Purchase Order*," R.1-7, PID 303 (emphasis added), and the purchase orders that defined Ultrafog's work were issued solely to Ultrafog. Accordingly,

even if FOGTEC eventually performed substantially similar work, it was not doing the same "Work" as Ultrafog because Ultrafog's "Work" was its to complete alone based on the purchase orders between itself and ORR.

**D.**

Lastly, Ultrafog argues that the district court erred in granting judgment on the pleadings because material issues of fact exist regarding whether all the deficiencies identified in Navillus's February 20, 2020, letter can be attributed solely to ORR. Ultrafog argues that the district court should have permitted discovery on the question whether Ultrafog's termination was occasioned by the sole default of ORR. We agree that, although the district court did not err in its interpretation of the parties' agreement, material issues of fact rendered its grant of judgment on the pleadings premature.

"For purposes of the 12(c) motion, all well-pleaded material allegations of the pleadings must be taken as true and the motion is granted only when no material issue of fact exists and the moving party is entitled to judgment as a matter of law." *Ross, Brovins & Oehmke, P.C. v. Lexis Nexis Grp., a Div. of Reed Elsevier Grp., PLC*, 463 F.3d 478, 487 (6th Cir. 2006). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In its order granting ORR's motion for judgment on the pleadings, the district court did not acknowledge Ultrafog's request for discovery or its contention that material issues of fact precluded judgment on the pleadings.

The record before the district court does not conclusively establish that Navillus's complaints about the Work were for "reason[s] other than the sole default of ORR." R.1-7, PID 308 (¶ 17). The allegations in the complaint, which we must accept as true for purposes of this

motion, adequately support the inference that Ultrafog's failure to satisfy Navillus was caused by ORR's actions or inactions alone. For example, Ultrafog alleges that the Prime Contract does not require fire-suppression systems testing in Spain if it can demonstrate an existing series of tests that "are applicable and relevant to the specific dimensions and conditions of the Hugh L. Carey Tunnel." R.1, PID 5 (¶ 22) (quoting R.1-5, PID 170). However, when it asked ORR to execute a non-disclosure agreement so that it could share the results of a test it had independently conducted for an unrelated project, ORR failed to do so. Additionally, Ultrafog alleges that it submitted a quote to ORR for fire-suppression system testing in Spain, but ORR failed to submit a purchase order for such testing.

Although, on appeal, ORR characterizes these as "improper extracontractual conditions and costs" that it rightly refused, Appellee Br. at 7, the pleadings themselves do not establish that as fact. Nor do the various documents make clear on their face whether ORR actually purchased the testing at issue. Despite ORR's characterization of Ultrafog's request for a non-disclosure agreement as extracontractual, neither the Terms and Conditions nor the Prime Contract prohibit it.[5] ORR's argument that it properly refused to submit a purchase order as an additional cost because the Prime Contract "expressly incorporated" the testing into the project's scope of Work, Appellee Br. at 7, is also not dispositive. It is true, as ORR points out, that the Terms and Conditions require Ultrafog to familiarize itself with the Prime Contract before starting the Work.

---

[5] Although Judge Griffin argues that Ultrafog was "not entitled" to make such a request of ORR, Griffin Dissent at 26, he does not cite any particular provision of the Terms and Conditions or the Prime Contract evidencing such a prohibition. It therefore does not necessarily follow that "Ultrafog must share some of the blame for the failure to establish equivalency" by making such a request. *Id.* Judge Griffin responds that although nothing in the Terms and Conditions actually prohibited Ultrafog from making the request, its "later refusal to disclose its test results without a non-disclosure agreement" was "*a reason* why Navillus stopped work." *Id.* at 26 n.1. But nowhere in its termination letter does Navillus mention Ultrafog's request for a non-disclosure agreement. Again, Navillus's termination letter on its face does not exclude the possibility that Ultrafog's purported deficiencies were solely attributable to ORR and its failure to properly supervise and communicate with its subcontractor, Ultrafog.

But the Prime Contract did not come into existence until after the first purchase order was issued and several months after Ultrafog submitted its proposal to ORR. Further, it is not clear from the documents that Ultrafog committed itself to perform all of ORR's undertakings under the Prime Contract, including those not part of a purchase order.

Ultrafog also plausibly alleges that ORR is solely responsible for the staffing and scheduling-related deficiencies cited in Navillus's termination letter. The staffing requirements are not apparent from the face of the Purchase Orders, Prime Contract, or Terms and Conditions, and Ultrafog alleges that ORR did not provide it with any staffing requirements or a work schedule in the course of their working relationship. Construing the allegations in the light most favorable to Ultrafog, a factfinder could attribute these issues solely to ORR's default in providing necessary information.[6] Finally, Ultrafog argues that neither Navillus nor ORR gave any indication that its work was inadequate, and raises the factual issue whether Navillus made requests of ORR that ORR failed to present to Ultrafog.

In light of these allegations, "there is certainly a 'set of facts' which, if accepted by the trier of fact, 'would entitle [Ultrafog] to relief.'" *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 725

---

[6] Judge Griffin contends that the staffing- and scheduling-related deficiencies identified by Navillus were sufficient grounds for termination in light of Ultrafog's responsibility to review the Prime Contract and perform the Work to Navillus's satisfaction. Griffin Dissent at 26. But these broadly worded provisions of the Prime Contract do not outline any such staffing or scheduling requirements with particularity. To be sure, the Prime Contract provides that "[t]he Subcontractor shall give the Work constant attention and supervision through a responsible representative or superintendent, and any necessary assistants" who "shall attend all job meetings[.]" R.1-5, PID 51. But the pleadings do not establish that Anders Kjellberg and Daniel Hunt, the two individuals mentioned in Navillus's termination letter, were the individuals whom the parties agreed would be the "responsible representative[s]," "superintendent[s]," or "necessary assistants," *id.*, within the meaning of the Prime Contract. It is, moreover, unclear whether their failure to be "active in the weekly design review meetings," R.1-10, PID 345, means they were absent from the meetings altogether or were present at but did not actively participate in such meetings. Similarly, it is not apparent that Kjellberg and Hunt's conduct amounted to a failure to "give the Work constant attention and supervision," R.1-5, PID 51, or if it did, why they apparently failed to do so. Finally, although the Prime Contract does, as Judge Griffin notes, require the timely completion of project schedules and submittals, *see* Griffin Dissent at 27, we reiterate that nothing in Navillus's letter, nor any other pleading, conclusively establishes that ORR's sole default was not the cause of Ultrafog's failure to satisfy this or any other contractual obligation.

(6th Cir. 2010) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)).  Although ORR suggests that a factfinder could not "retroactively find that Ultrafog's failings were instead aggravated by ORR's separate failures and therefore conclude that ORR was solely at fault for both of their failures," Appellee Br. at 31, we think this misstates the issue.  To be sure, Navillus faulted Ultrafog, and Ultrafog only, for the various deficiencies cited in its termination letter.  But that does not mean that these deficiencies were not caused by ORR and ORR alone.  If factual development supports Ultrafog's claims, then Navillus's termination of the Work could plausibly be attributed to ORR's sole default.  Of course, when the facts are developed, ORR may ultimately show that there is no genuine dispute that it was not solely responsible for Navillus's termination of Ultrafog.  But that would be established in a motion for summary judgment.

Accordingly, we reverse the grant of judgment on the pleadings to ORR.

### III.

The district court did not err in its interpretation of Section 17 of the Terms and Conditions and the circumstances under which ORR was entitled to invoke its early termination provision.  Nevertheless, material issues of fact exist regarding whether Navillus stopped the Work for a reason other than the sole default of ORR.  Accordingly, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings.

**CLAY, Circuit Judge, concurring in part and dissenting in part.** I concur in the lead opinion's reversal of the district court's grant of ORR's motion for judgment on the pleadings because Ultrafog has plausibly alleged that the deficiencies identified in the letter from the primary contractor, Navillus, can be attributed solely to ORR. But because material issues of fact exist regarding whether ORR was entitled to immediately terminate Ultrafog from the project, I dissent as to the remaining parts of the lead opinion and would reverse the district court's grant of Defendant's motion for judgment on the pleadings as to all claims.

## BACKGROUND

This case centers on a contract Navillus Contracting (not a party to this case) received from the New York Triborough Bridge and Tunnel Authority to rehabilitate a New York City tunnel. The project included an update to the tunnel's fire protection system. As the project's primary contractor, Navillus entered into a subcontract with Defendant ORR ("Prime Contract") in which the latter would provide design and fabrication services and update the tunnel's fire protection system. Thereafter, ORR sub-subcontracted with Plaintiff Ultrafog, a developer of high-pressure sprinkler systems. Ultrafog and ORR, in turn, entered into four separate purchase orders wherein Ultrafog agreed to provide work on the fire protection system for the tunnel project.[1] The purchase orders are governed by ORR's Terms and Conditions (the "Terms and Conditions"). The Terms and Conditions form the basis of Ultrafog's breach of contract claim. Sections 16 and 17 merit mention.

Section 16 specifies ORR's remedies upon default by Ultrafog. It reads:

**Default of Subcontractor.** Should Subcontractor at any time (a) breach this Agreement, a Purchase Order or its obligations pursuant to the Prime Contract; (b) cause stoppage or delay of or interference with the Project, or any portion thereof; or

---

[1] In total, there were four purchase orders between ORR and Ultrafog: P148664, P152467, P153095, and P153906.

(c) become insolvent, then, in any such event, each of which shall constitute a default hereunder by Subcontractor, ORR shall, after giving Subcontractor written notice of default and forty-eight (48) hours within which to cure such default, have the right to exercise any one or more of the following remedies: a. Require that Subcontractor utilize, at its own expense, overtime labor (including Saturday and Sunday work), in additional shifts as necessary to overcome the consequences of any delay attributable to Subcontractor's default; and/or b. Attempt to remedy the default by whatever means ORR may deem necessary or appropriate, including, without limitation, correcting, furnishing, performing or otherwise completing the Work, or any portion thereof, by itself or through others (utilizing where appropriate any materials and equipment previously purchased for that purpose by Subcontractor) and deducting the cost thereof (plus an allowance for administrative costs equal to twenty percent (20%) of such costs) from any monies due or that become due to Subcontractor hereunder.

(Terms and Conditions, R. 1-7, PageID ## 307–08).

Section 17 governs when either party can immediately terminate the agreement:

**Early Termination**. Either party may immediately terminate this Agreement if the other party fails to cure any material breach of this Agreement within thirty (30) days after receipt of written notice of such breach from the other party. b. If Owner terminates the Prime Contract, or stops the Work for a reason other than the sole default of ORR, ORR may immediately terminate this Agreement or stop the Work for the same reason, and Subcontractor's rights and remedies, including payment of any unpaid and earned portion of the Price, shall be limited to the corresponding rights and remedies available to ORR under the Prime Contract.

(*Id.* at PageID # 308).

On February 20, 2020, Navillus issued a written letter to ORR, "request[ing] ORR to terminate Ultrafog from the Project with immediate effect." (Feb. 20, 2020 Letter, R. 1-10, PageID # 346). Navillus stated that "Ultrafog has caused the design process on the Project to become inefficient & inadequate" due to inadequate staffing, shortcomings in maintaining project schedules, failure to set up fire testing proposals that would be equivalent to the tunnel's specifications, and their inability to certify their system's equivalency to the needs of the tunnel. (*Id.* at PageID # 345). According to the letter, these issues had been "discussed [with ORR] on numerous occasions." (*Id.*). However, Plaintiff claims that ORR never raised any of the foregoing issues with it prior to March 3, 2020; on that day, ORR notified Ultrafog of Navillus' request to

terminate Ultrafog from the project. Defendant invoked Section 17 of the Terms and Conditions between ORR and Ultrafog, and the Prime Contract between Navillus and ORR, as the dual bases of the termination. (Mar. 3, 2020 Letter, R. 1-9, PageID # 343 (instructing Ultrafog to "stop all work associated with the" tunnel project)).

On December 3, 2020, Ultrafog filed a one-count breach of contract claim, contending ORR violated the Terms and Conditions by terminating Ultrafog effective immediately rather than first giving it written notice of breach followed by an opportunity to cure. Defendant moved for a motion for judgment on the pleadings. Upon review, the district court granted ORR's motion and dismissed the complaint. Ultrafog's timely appeal followed.

## DISCUSSION

### Standard of Review

In reviewing a district court's grant of a motion for judgment on the pleadings, "we must construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of [its] claim that would entitle [plaintiff] to relief." *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 512 (6th Cir. 2001). Granting such a motion is appropriate only "when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *JPMorgan Chase Bank v. Winget*, 510 F.3d 577, 582 (6th Cir. 2007) (citation omitted). In the instant case, Plaintiff Ultrafog surmounts this low bar.

### Analysis

"As a federal court sitting in diversity, we apply the choice-of-law provisions of the forum state." *NILAC Int'l Mktg. Grp. v. Ameritech Servs., Inc.*, 362 F.3d 354, 358 (6th Cir. 2004) (citing another source). The parties do not dispute that Kentucky law applies. To state a claim for breach

of contract under Kentucky law, a plaintiff must prove: (1) the existence of a contract; (2) a breach of that contract; and (3) that the breach caused damages.[2] *EQT Prod. Co. v. Big Sandy Co., L.P.*, 590 S.W. 275, 293 (Ky. Ct. App. 2019). Our review begins "with an examination of the plain language of the instrument." *Ky. Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694 (Ky. 2016).

Determining whether a contract is ambiguous is a legal inquiry for the Court. *First Commonwealth Bank of Prestonsburg v. West*, 55 S.W.3d 829, 835 (Ky. Ct. App. 2000). When no ambiguity exists, we look only as far as the four corners of the document to determine the parties' intentions, *3D Enters. Contracting Corp. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005), and the instrument will be enforced according to its terms and ordinary meaning. *Ky. Shakespeare Festival*, 490 S.W.3d at 694. Conversely, "[a] contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." *Id.* at 695 (citing another source). "If the language is ambiguous, [our] primary objective is to effectuate the intentions of the parties," with ambiguities interpreted against the drafter, *Cantrell Supply, Inc. v. Liberty Mutual Ins. Co.*, 94 S.W.3d 381, 384 (Ky. App. 2002).

It should first be noted that the relevant portions of the parties' principal contract, called the Terms and Conditions, are Sections 16 and 17. Section 16, "Default of Subcontractor," requires ORR to give Ultrafog written notice of default and a forty-eight hour opportunity to cure. Section 17, in its "Early Termination" provision, has two prongs. The first allows either party to immediately terminate the contract if the defaulting party fails to cure within thirty days of receiving notice of default. The second, 17b, is at the heart of the instant dispute. It states: "If

---

[2] In Ultrafog's one-count claim breach of contract claim, it contends that each purchase order constituted a valid contract; Ultrafog performed all of its obligations under each purchase order; and ORR has breached Section 17 of the Terms and Conditions by terminating Ultrafog and canceling all outstanding purchase orders.

Owner [i.e., Navillus] terminates the Prime Contract, or stops the Work for a reason other than the sole default of ORR, ORR may immediately terminate this Agreement or stop the Work for the same reason[.]" (Terms and Conditions, R. 1-7, PageID # 308).

The district court credited Defendant's argument that no breach of contract occurred because Section 17b permitted ORR to immediately terminate all purchase orders with Ultrafog without notice or an opportunity to cure. On appeal, the question is whether the district court construed the complaint in the light most favorable to Plaintiff and accepted all factual allegations as true in finding that Ultrafog failed to state a claim for breach of contract. It did not, and I would reverse in full. Thus, I dissent from the lead opinion's analysis in Section II, Parts B and C. Two points support this outcome.

First, Defendant ORR is not "clearly entitled to judgment" on its claim that immediate termination was proper under Section 17b. *Winget*, 510 F.3d at 581. Particularly unconvincing is ORR's contention that 17b exists separate and independent from Section 16 (requiring written notice and forty-eight hours to cure the default) and the first sentence of Section 17 (requiring thirty-day notice of breach). Nothing in the contract indicates that Section 17b exists by itself, to the exclusion of other contract terms. What is more, this Court must, when possible, give effect to all terms of the contract. *City of Louisa v. Newland*, 705 S.W.2d 916, 919 (1986) ("Any contract or agreement must be construed as a whole, giving effect to all parts and every word in it[,] if possible."). This obligation is most apparent where, as in this case, certain contractual terms are somewhat ambiguous and should be interpreted against the drafter. *Maze v. Bd. of Dirs. of Commonwealth Postsecondary Educ. Prepaid Tuition Tr. Fund*, 559 S.W.3d 354, 362 (Ky. 2018). To affirm the district court's order would be to render Section 16 and the first half of Section 17 a nullity. *Henderson v. Cont'l Cas. Co.*, 39 S.W.2d 209, 211 (Ky. 1935) ("Kentucky law strongly

disfavors an interpretation of a contract that would either render the contract a nullity or fail to give effect to the intent of the parties."). Consequently, I would find that the well-pled complaint supports an inference that ORR was not entitled to avail itself of Section 17b's immediate termination provision; if that inference is borne out, then ORR could only terminate Ultrafog from the project after giving it notice and an opportunity to cure, pursuant to Section 16 or the first part of Section 17.

Second, Ultrafog alleges that Section 17b's prerequisite was not triggered, meaning the remedy of immediate termination was unavailable to ORR; taking that allegation as true, the complaint presents "sufficient factual matter," adequate to overcome a motion for judgment on the pleadings. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Section 17b, when read in isolation, allows ORR to immediately terminate Ultrafog from the contract only where Navillus "stop[ped] the Work." (Terms and Conditions, R. 1-7, PageID # 303). "Work" is defined, in part, as "the services as detailed in the Purchase Order and as provided herein, including any fire detection/suppression or related activity." (*Id.*). The district court appears to presume that Navillus "stopped the Work" in its letter instructing ORR to terminate Ultrafog from the project. However, the issues Navillus purportedly had with Ultrafog's performance—issues with staffing and scheduling—might not fall within the scope of the contractually defined term, "Work," which would suggest that the prerequisite for an immediate termination under Section 17b, i.e., the stopping of "Work," never occurred. If Plaintiff shows the "Work" was never stopped, then ORR was not entitled to invoke 17b to immediately terminate the contract. At this early stage, I would reverse and remand with instructions for the district court to permit the case to proceed—with the factfinder considering the factual circumstances pertaining to the parties' intent and course of

dealing. In that regard, the parties' shared or divergent understandings of the term "stop the Work" and the weighing of the impact of the Navillus letter could be considered and addressed.

## CONCLUSION

In sum, when accepting factual allegations as true and construing the pleadings in the light most favorable to the non-movant, Ultrafog has stated a plausible breach of contract claim as a matter of law against ORR, sufficient to survive a motion for judgment on the pleadings. For these reasons, I concur in Section II, Part D of the lead opinion that Ultrafog plausibly alleges that ORR could be held solely responsible for the deficiencies set forth in Navillus' termination letter, but respectfully dissent from the remainder of the opinion.

GRIFFIN, Circuit Judge, dissenting.

I join Judge White's opinion except as to its introductory paragraph, and Sections II.D and III. In my view, Ultrafog's complaint raises no issue of fact regarding whether ORR could be solely responsible for Navillus's decision to stop work. Even viewed in the light most favorable to Ultrafog, the complaint and its attachments clearly show that Ultrafog's own actions caused Navillus's decision. Accordingly, ORR properly exercised its contractual right to immediately terminate Ultrafog from the project. I would affirm, so I respectfully dissent from the majority's judgment.

I.

Although we must accept Ultrafog's allegations as true, *see JPMorgan Chase Bank, N.A., v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007), the relevant contractual language provides an exceedingly narrow basis for Ultrafog's breach-of-contract claim. Section 17b of the applicable Terms and Conditions allowed ORR to "immediately terminate" its agreement with Ultrafog if Navillus "stops the Work for a reason other than the sole default of ORR." R. 1-7, PID 307–08. This language signifies causation. *Cf. Crosby v. Twitter*, 921 F.3d 617, 623 (6th Cir. 2019). Put differently, if Navillus decided to stop work because of anything not wholly attributable to ORR, then ORR could terminate Ultrafog from the project immediately without breaching the contract.

Navillus detailed its reasons for stopping work in the February 20, 2020 letter to ORR. Navillus stated that Ultrafog was "not performing satisfactorily or to the standards that Navillus expects and requires from all contractors on [the Hugh L. Carey Tunnel project]." According to Navillus, Ultrafog "caused the design process on the Project to become inefficient & inadequate." The company provided a dozen examples of Ultrafog's shortcomings:

- The Ultrafog employee identified as a "key component" to the Fire Testing Protocol had not been "active in the weekly design review meetings since the start of the Project."

- The Ultrafog employee identified as a "key component" to Mechanical Design had not been "active in the weekly design review meetings since the start of the Project."

- "Ultrafog did not submit a schedule two (2) weeks after the contract award as required."

- "Ultrafog consistently allowed submittals [to] go overdue."

- "Ultrafog did not follow a schedule for their portion of the work."

- "Fire testing dates were changed several times from September 2019 through June 2020."

- "Fire testing dates scheduled for early March 2020 were lost without adequate notification to the team."

- "Fire test setup proposed does not equivalate to the Hugh L Carey Tunnel."

- "Fire testing schedule submitted shows an alternate agenda. Ultrafog committed to only two (2) of the twelve (12) tests proposed on the schedule."

- "Fire testing schedule included tests under a European directive not in compliance with NFPA."

- "Ultrafog IMO & FM approval certificates are for an application not suited to the Hugh L Carey Tunnel."

- "Ultrafog did not demonstrate equivalency between previous Ro-Ro testing results and the Hugh L Carey Tunnel to the Authority Having Jurisdiction."

R. 1-10, PID 345–46. Navillus's reasoning speaks for itself. No reasonable evaluation of Navillus's decision-making process could assign *sole* responsibility for *all* these issues to ORR. For example, "a reason" that Ultrafog did not demonstrate equivalency between preexisting tests of its system and the tests required under the Prime Contract was because Ultrafog insisted on a non-disclosure agreement, which ORR did not agree to. Even if we can fault ORR for its rejection

of Ultrafog's proposal, we must also fault Ultrafog for suggesting the agreement in the first place—it was not entitled to do so under the Terms and Conditions that governed the subcontractors' relationship.[1]  Thus, Ultrafog must share some of the blame for the failure to establish equivalency.  Because Navillus premised its decision partly on this failure, and because Ultrafog was partly at fault, Navillus stopped work for "a reason other than the sole default of ORR."  ORR was therefore permitted to terminate Ultrafog immediately.

The majority compounds its failure to properly distribute responsibility by devolving to speculation, which cannot save Ultrafog's claim from a motion for judgment on the pleadings. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Winget*, 510 F.3d at 581.  Searching for a "set of facts" that could support a breach-of-contract claim, my colleagues hold that a factfinder could attribute Ultrafog's problems regarding scheduling and staffing solely to ORR's alleged default in providing necessary information.  I do not see how.  Ultrafog would have had to think it was acceptable for its key staff to opt out of design meetings; for it to submit tardy schedules; for it to fail to adhere to schedules; for it to move tests without notice; and for it to agree to only one-sixth of the tests proposed.  And the contract between Ultrafog and ORR forbids operating this way.  Under that agreement, Ultrafog had an obligation to "in a timely manner check and review the Prime Contract," and to "perform the Work . . . to the satisfaction of [Navillus]."  R.1-7, PID 306.  The Prime Contract included detailed provisions regarding staffing, scheduling, and

---

[1] Contrary to the majority's assertion, I do not read the Terms and Conditions as prohibiting Ultrafog's request for a non-disclosure agreement.  Indeed, the Terms and Conditions do not mention such an agreement at all.  That is the problem:  Ultrafog requested a new condition to fulfill its existing contractual duties.  To be sure, Ultrafog was free to request this condition without breaching the contract.  But Ultrafog's later refusal to disclose its test results without a non-disclosure agreement remains *a reason* why it failed to establish equivalency, which in turn is *a reason* why Navillus stopped work.  For our purposes, that is all that matters.  The majority ignores this natural causation, instead acting as if anything not explicitly prohibited by the contract can be done without consequence.

testing. R. 1-5, PID 51 ("The Subcontractor shall give the Work constant attention and supervision through a responsible representative or superintendent, and any necessary assistants. Such representative shall attend all job meetings[.]"); PID 91 (requiring the completion of an "Overall Project Schedule" that "achieve[s] Substantial Completion and Final Completion by December, 2021" and the timely completion of submittals); PID 69–71 (providing requirements related to the testing of Ultrafog's system). Either Ultrafog did not review and understand its contractual obligations, or it did not perform its work to the satisfaction of Navillus. Neither situation is the "sole default of ORR."

## II.

If any one of the reasons for Navillus's decision to stop work was even partly the fault of something other than ORR, ORR had the right to terminate Ultrafog under Section 17b. Any reasonable reading of the complaint shows that Ultrafog must shoulder some blame for its failures on the Hugh L. Carey Tunnel project. I would therefore affirm the judgment of the district court.